UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION,

      Plaintiff,

      v.                                  Civil Action No.: 10-CV-00747 RTR

SUJATA SACHDEVA AND
JULIE MULVANEY,

      Defendants.

---

**BRIEF OF JULIE MULVANEY IN SUPPORT OF THE PROPOSED
FINAL CONSENT JUDGMENT RESTING ON A SETTLEMENT
AGREEMENT OF DECEMBER 19, 2011 CONTAINING A
PROSPECTIVE INJUNCTION AND A NON-ADMISSION OF LIABILITY
TERM**

---

## STATEMENT OF THE CASE

> It is not, however, the proper function of federal courts to dictate policy to executive agencies. "(F)ederal judges – who have no constituency – have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: 'Our constitution vests such responsibilities in the public branches.'" … (Citation omitted.)

United States Securities & Exchange Commission v. Citigroup Global Markets, Inc., 673 F.3d 158, 163-164 (2nd Cir. 2012).

This is not an embezzlement case involving use of the instrumentalities of interstate commerce in violation of 18 U.S. 1341 – the crime to which Ms. Sachdeva pled guilty and was sentenced to 11 years in prison.

This is a civil securities fraud action arising under the Securities Exchange Act of 1934 – an enactment designed to protect investors, present and future, by means of a complex, detailed regulatory architecture. This complicated regulatory system has been the subject of much judicial elaboration, generating an equally complicated body of decisional law expressed in Supreme Court and 7th Circuit decisions.

This regulatory structure provides the background against which the Court should evaluate whether the aggregate social benefits of the contract reached between the parties exceed the aggregate social costs acceptance might impose on third parties, outside the immediate contract circle.[1] The Court should approve the terms of the settlement, embedded in the consent decree, if it believes that a responsible, executive prosecutorial agency, the Securities and Exchange Commission ("SEC"), could reasonably conclude that the settlement confers a net social benefit.[2] It is not for the Court to determine, de novo, what the correct social cost/social benefit calculus might be.[3]

On December 19, 2011, Ms. Mulvaney entered into a contract with the SEC by the terms of which she would transfer $67,600 in aggregate to the SEC and to the U.S. Treasury.[4]

---

[1] A Settlement Agreement is a contract, a mutually accepted set of terms, judicially enforceable. That the Settlement Agreement is embedded in a Consent Judgment, a prospective injunction, enforceable by contempt, doesn't alter the contractual foundation upon which the Consent Decree rests. It is, after all, a Consent Decree/Judgment. U.S. v. Armour & Co., 402 U.S. 673, 674-683 (1971).

[2] SEC v. Citigroup Global Markets, Inc., 673 F.3d 158, 163-165, 168 (2nd Cir. 2012).

[3] SEC v. Citigroup Global Markets, Inc., supra at 163-165, 168.

[4] See ¶¶ VI & VII of the August 13, 2012 proposed Final Judgment – the Consent Judgment (Docket No. 37-2); and ¶ 2(b)(c) of the December 19, 2011 Consent (Docket No. 37-1). The $67,600 aggregate has been allocated by the SEC between a $40,000 Third Tier penalty payable to the U.S. Treasury pursuant to Section 21(3)(B)(iii)(aa) and c(i) of the Securities Exchange Act of 1934 (15 U.S.C. 78u(3)(B)(iii)(aa) and c(i)), and a "disgorgement of $22,600 in "illegal profits," as determined by the SEC, payable to the SEC, plus pre-judgment interest of $5,000 on the $22,600. Ms. Mulvaney consents to this allocation and denomination of the $67,600 aggregate.

2
Case 2:10-cv-00747-RTR   Filed 11/05/12   Page 2 of 18   Document 44

Ms. Mulvaney also agreed to prospectively refrain from certain behaviors related to the preparation of financial statements upon which various required filings with the SEC rest.[5]

But Ms. Mulvaney did not admit to any allegations of the August 31, 2010 Complaint,[6] or to any of the assertions about her behavior in paragraph 2 of the August 13, 2012 Motion for entry of Final Judgment, Docket No. 37.[7] Nor has she admitted to the allegations set forth at pp. 3-5 in the SEC's Memorandum of October 15, 2012, in support of the Settlement, Docket No. 39.

Neither does she deny those allegations.[8] And she also has committed to not taking to the Courthouse steps, as it were, should this Consent Judgment, resting on the Settlement Agreement, be accepted as a Final Judgment by the Court, and publically announcing, "I didn't do it, even if I agreed to a Consent Judgment."[9]

In its Decision and Order of September 14, 2012, Docket No. 38, the Court was reluctant to approve the August 13, 2012 proposed Final Judgment because the Court was unsure whether there was a sufficient "factual basis" to conclude that the Judgment was "fair, reasonable, adequate and in the public interest" as that standard was elaborated and applied by Federal District Judge Jed Rakoff in SEC v. Citigroup Global Markets, Inc., 827 F.Supp. 328 (S.D. N.Y. 2011).

---

[5] See ¶¶ I-V of the August 13, 2012 proposed Final Judgment (Docket No. 37-2); and ¶ 2(a) of the December 19, 2011 Consent (Docket No. 37-1).

[6] See Docket No. 1.

[7] See the first sentence of ¶ 2 of the December 19, 2011 Consent of Ms. Mulvaney (Docket No. 37-1).

[8] Id.

[9] See ¶ IX(h) and IX(h)(i)(ii) at p. 9 of the August 13, 2012 proposed Final Judgment (Docket No. 37-2).

In that case, Judge Rakoff declined to accept the proposed agreed-upon Consent Judgment calling for a transfer of $285 million dollars, primarily because Citigroup Global Markets, Inc. (Citigroup), like Ms. Mulvaney, refused to admit to any conduct that might impose civil liability under the Securities Exchange Act of 1934, though Citigroup did not deny any of the allegations relating to transactions involving the sale, by Citigroup, of securities "securitized" by bundled residential mortgages, while Citigroup was simultaneously "shorting" its own investment in the same security it was promoting.[10]

Judge Rakoff ordered the parties to trial in early July 2012 and both the SEC and Citigroup appealed the denial of acceptance of the Settlement Agreement and each sought a stay of the Order to proceed to trial.[11]

A panel of the Court of Appeals for the Second Circuit granted the stay and another "merits" panel is actively considering the substance of Judge Rakoff's decision to reject the settlement.[12]

The panel granting the stay of the trial order made it clear, in a per curiam opinion, that they believed Judge Rakoff to be wrong on the "merits" for reasons we will discuss shortly.[13] At this moment, then, there is no final decision in Citigroup, 11-5242, the "merits" case, a case in which any army of amici have waded in.[14]

Ms. Mulvaney urges the Court to accept the December 19, 2011 Settlement Agreement, upon which the August 2012 proposed Consent Judgment rests. Ms. Mulvaney accepts, without

---

[10] SEC v. Citigroup Global Markets, Inc., 827 F.Supp. 328, 329, 332-335, 334 n.7 (S.D. N.Y. 2011).

[11] Citigroup, 827 F.Supp. at 335.

[12] Citigroup, 673 F.3d at 163-169.

[13] Citigroup, 673 F.3d at 163-169.

[14] See Docket entry Nos. 58-147 in 11-5242, 2nd Cir., SEC v. Citigroup Global Markets, Inc.

qualification, all the terms of the Agreement and the Consent Decree. If the Court does not accept the proposed Consent Judgment, Ms. Mulvaney is determined to go to trial.

Acceptance of the Agreement and entry of the Consent Judgment, with no more ado, will confer a net social benefit. At the least, an executive prosecutorial agency has so concluded, and the constitutional principal of separation of power compels the Court to accept that executive Judgment.

**ARGUMENT**

I. **THE AGGREGATE SOCIAL BENEFITS OF JUDICAL ACCEPTANCE OF THE JOINT SETTLEMENT AGREEMENT AND CONSENT JUDGMENT WILL EXCEED ANY SOCIAL COSTS THAT MIGHT BE IMPOSED BY ACCEPTANCE OF A SETTLEMENT CONTAINING A NON-ADMISSION CLAUSE.**

   A. **The Costs Of A Trial, Which Would Be Considerable, Are Avoided. This Is A Social Benefit.**

The aggregated costs of a civil fraud trial are a social cost that can be avoided by judicial acceptance of a joint settlement agreement. Trials impose considerable costs on the scarce resources of the federal judicial system – a system external to the needs and desires of the SEC and Ms. Mulvaney, a system supported by public funds. Avoidance of this externality is, thus, a positive social benefit. Limited judicial resources can be applied to other productive uses. At the least, scarce resources are conserved.[15]

---

[15] See generally, Posner, <u>Economic Analysis of Law</u>, Eight Edition, at Section 21.10 pp. 775-777 (2011). This is an analysis of the net social benefits conferred by the practice of acceptance of "plea bargains" in the federal criminal system, a procedure closely analogous to acceptance of settlements in civil fraud cases which entail an agreed upon transfer of money of a certain magnitude from the private defendant to the public treasury in exchange for a non-admission of liability – a "lighter sentence" as it were. The analysis emphasizes the considerable aggregate social benefit conferred by avoidance of the substantial social costs of fully conducted trials in which outcome, assessed <u>ex ante</u>, is uncertain.

5

### 1. The "Scienter" Defense.

The panel of the Second Circuit, that granted the stay of Judge Rakoff's order to go to trial forthwith, held that District Court's considering whether to accept a joint settlement, that contours a non-admission clause, should not assume the defendant's guilt.[16] That was to be treated as an open question, and the District Court should take into consideration the complexity of a trial of a securities civil fraud case, when assessing the social cost/social benefit ratio of acceptance or non-acceptance of the proposed settlement and consent decree.[17]

Ms. Mulvaney's defense at trail would center on the concept of "scienter," that unlovely term that is a shorthand for a necessary element of the offense: The SEC must prove at trial that it is more probable than not that Ms. Mulvaney purposefully aided and abetted Ms. Sachdeva's embezzlement, knowing full well that her conduct was designed to achieve that end – the theft – and that she personally "profited" from that assistance.[18]

The Complaint, with some exceptions, charges her with "knowingly" violating Sections 10(b), SEC Regulation 10-b-5, the basic securities fraud provisions plus "knowingly" violating certain SEC regulations specific to filing certain required documents with the SEC, prepared in a manner consistent with reliable and accurate accounting procedures.[19]

---

[16] Citigroup, supra at 163-164

[17] Citigroup, supra at 164.

[18] Ernst & Ernst v. Hochfelder, 425 U.S. 185, 190-191, 190 n.5, 197-201, 213-214 (1976); Aaron v. SEC, 446 U.S. 680, 681, 686 n.5, 690-695 (1980); Pugh v. Tribune Company, 521 F.3d 686, 693-698 (2008); Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II), 513 F.3d 702, 704-712 (7th Cir. 2008); Sundstrand Corp. v. Sun Chemical Corp., 553 F.2d 1033, 1044-1048 (7th Cir. 1977). See also, Puskala v. Koss Corporation, 799 F.Supp. 2d 941, 946 (E.D. Wis. 2011).

[19] Docket No. 1, Complaint paragraphs 2-3, 21-37, 62-64, 70-71, 79-82. The only charge that does not require proof of "the required scienter" is the claim that Ms. Mulvaney violated Section 13(a) and SEC Rules 13(a)-1, 13(a)-11, and 13(a)-11, paragraphs 74-77. But these statutory provisions and the administrative rules only obliged Koss, a public company, to file certain financial disclosures at specified times. Koss did that without any material assistance or hindrance from Ms. Mulvaney. More on that later. See Docket No. 9, Mulvaney Answer paragraphs 80, 82. These norms do not require that the data embedded in the disclosures be materially correct. Other statutory provisions and administrative regulations that SEC claims Ms. Mulvaney violated cover the subject of "knowingly"

Her answer, and the admissions in her Rule 26(a)(i) initial disclosures, admit to engaging in certain behaviors not consistent with Generally Accepted Accounting Procedures, and the norms of the Financial Accounting Standards Board (FASB), norms and procedures adopted by the SEC as legally required obligations. However, in all cases, Ms. Mulvaney's answer and initial disclosures assert that her behavior was directed by Ms. Sachdeva, her immediate supervisor to whom she was a subordinate, as well as a personal friend. Ms. Sachdeva assured her that, in the end, the adjustments Ms. Mulvaney was making in basic financial records – the General Journal, specific ledger accounts, manipulations of <u>paid</u> receivables, manipulation of various costs, etc., were proper.[20] Ms. Mulvaney, a very competent accountant, chose the details of the adjustments, but Ms. Sachdeva gave her that the global "numbers" that had to be adjusted to "make the books balance."[21] At no time was Ms. Mulvaney consciously aware that Ms. Sachdeva was embezzling Koss Corporation funds.[22]

As to transactions involving use of Koss funds to pay Ms. Sachdeva's personal consumption tastes by means of wire transfers, cashier (bank) checks, and petty cash disbursements, Ms. Mulvaney either did not know the details of the transfer transactions, or if she did, she received assurances from Ms. Sachdeva that the transfers covered legitimate business expenditures.[23]

---

aiding and abetting embedding material false information in the filings. Paragraphs 74-77 are an unnecessary, and factually groundless "piling-on" by the SEC.

[20] Docket No. 9, Answer of Ms. Mulvaney, ¶¶ 1-3, 6-7, 9-11, 16-17, 21-37, 45-48, 54, 62, 70, 75, 81; Docket No. 27, Mulvaney Rule 26(a)(1)(A) Initial Disclosures. Ms. Mulvaney's statement as to her proposed testimony at trial – Admissions – pp. 1-7.

[21] Docket No. 27, Mulvaney Initial Disclosures, Ms. Mulvaney's statement of proposed testimony at trial pp. 3-4, 5-6.

[22] Docket No. 9, Mulvaney Answer, ¶¶ 3-4, 6, 11, 21-22, 27-28, 34, 46-48, 51-54, 57-59, 70, 75.

[23] Docket No. 9, Mulvaney Answer, ¶¶ 12-14, 16, 18-19, 62, 75; Docket No. 27, Mulvaney Rule 26(a)(1)(A) Initial Disclosures, Ms. Mulvaney's statement of proposed testimony at trial – Admissions pp. 4-5.

Finally, Ms. Mulvaney never sought, or in her view, never received any "profit" from Ms. Sachdeva for helping her steal money from Koss Corporation.

Ms. Mulvaney received personal loans from Koss funds totaling $20,000 through the efforts of Ms. Sachdeva.[24] But Ms. Sachdeva explicitly told her that Ms. Sachdeva would personally reimburse the Koss treasury for those loans and Mulvaney would owe <u>her</u> the money.[25] Ms. Mulvaney knew that Ms. Sachdeva made no serious effort to "collect" the loans. Ms. Mulvaney also knew Ms. Sachdeva did not reimburse the Koss treasury for $20,000.[26] These transfers were perceived by Ms. Mulvaney to be expressions of Ms. Sachdeva's well-known generosity toward people in need.[27]

So, there are two competing narratives of the relationship between Ms. Sachdeva and Ms. Mulvaney over a period of at least three years: Ms. Mulvaney's narrative that she was dominated by a strong-willed imperious superior, Ms. Sachdeva, who was also, in a complex way, a friend and confident, whose assurances that "all will be well in the end" Ms. Mulvaney unconditionally accepted.[28] The SEC's narrative that Ms. Mulvaney was acutely aware of Ms. Sachdeva's embezzlement and actively and purposely assisted her in execution of "the scheme" in return for anticipated and desired material profit.[29] The SEC is well aware that the "scienter" element is the fulcrum upon which the outcome of the litigation turns.[30]

---

[24] Docket No. 27, Mulvaney's Rule 26(a)(1)(A) Initial Disclosures – Admissions pp. 7, 10-11; footnote 12 to Mulvaney's Financial Statement to the SEC of April 1,2011, Exhibit 1 to this brief.

[25] Id.

[26] Id.

[27] Id.

[28] Footnote 12 to Mulvaney's Financial Statement of April 1, 2011 to the SEC. See also Footnotes 20-27. <u>Supra</u>.

[29] Docket No. 39, SEC Memorandum in Support of the Settlement, pp. 2-5; Allegation of the Complaint footnote 19, <u>supra</u>. A word about additional "loans". Ms. Sachdeva approved two other loans in the amount of $4,000, which Ms. Mulvaney paid back to Koss in full. Footnote 12 to Mulvaney April 1, 201 Financial Statement to the SEC. Without any involvement from Ms. Sachdeva, Ms. Mulvaney issued two personal checks amounting to $2,600 with

As the Court well knows, these are difficult psychological issues with which a jury must grapple with under the direction of the Court.[31] Resolving "objections" over matters of "relevance" and "credibility," when subjective psychological considerations dominate the narrative of the trial, is costly to all players, especially to the Court, in terms of demands on time as well as the imposition of emotional stress. Issues over instructions with respect to relevant "states of mind" (and "credibility" of witnesses) are especially difficult to cleanly resolve.

And in this case, there is a special, confounding variable: Ms. Sachdeva herself. The SEC has indicated that Ms. Sachdeva will be a prominent, if not the star, witness against Ms. Mulvaney. The narrative of the SEC's case rests entirely on Ms. Sachdeva's testimony and Ms. Mulvaney's "admissions," the meaning of which are hardly conclusive with respect to the crucial issue of "knowing", purposive, profit-driven conduct.[32]

The extra cost entailed in bringing Ms. Sachdeva from Danbury prison to Milwaukee under appropriate security conditions is obvious. The cost of efforts to present her to the Court and jury in a manner not obviously prejudicial to either side, or unnecessarily humiliating to Ms. Sachdeva, but consistent with Bureau of Prisons security requirements, may be less obvious, but no less real.

---

Koss petty cash as the payee. Those checks were in the petty cash box at the time Ms. Mulvaney was terminated in late 2009. Ms. Sachdeva changed the cash flow of Mulvaney's college tuition reimbursement plan, a plan initially approved by a Koss executive other than Ms. Sachdeva. Koss made periodic tuition payment up-front and Ms. Mulvaney reimbursed Koss, in full, upon successful completion of the course work, transfers on which she paid income tax. A reverse of the pay first – then reimburse initial plan. This transaction is less evidence of a quid-pro-quo for a cover-up than a lame padding of a thin SEC case for Mulvaney's "profit taking." See also, p.7 of Docket No. 27, Ms. Mulvaney's Initial Disclosures. See Loeffler letter to SEC Attorney Wood of September 20, 2011, pp. 1-6, Exhibit 2 to this Brief.

[30] Docket No. 39, SEC Memorandum in Support of the Settlement, p. 5 and footnote 3 at p. 5.

[31] The SEC requested a jury trial from the get-go and Ms. Mulvaney intends to hold the agency to that commitment, if the matter goes to trial. Docket No. 1 at p. 28.

[32] Docket No. 39, SEC Memorandum in Support of the Settlement, pp. 2-5, and especially footnote 2 at pp. 4-5. Mulvaney Brief in Support of the Settlement Agreement.

Finally, the Court can judicially note that L'affaire Sachdeva was a matter of high visibility and intense media interest through 2010 and early 2011. Puskala, supra at 955-956. Voir dire of the potential jurors and challenges to their fitness would be intense, and emotionally difficult, for all participants, not the least the Court.

Litigation turning on the meaning of long-term personal relationships which overlap with superior/subordinate relationship in the workplace, is always messy and the mess puts substantial strain on the judicial process.[33] Now, consideration of difficult issues under condition generating psychological pressures comes with the job of being a United States District Court Judge – a trial judge. That's what you sign up for – like joining the Marine Corps. Same for jurors. But the system can be so organized to optimize, not unnecessarily maximize, those stresses in the aggregate.

These are sunk costs every time a matter goes to full trial. From the ex ante perspective, before the trial gets under way (the correct perspective when considering whether to approve a proposed settlement). Citigroup at 163-164, 163 n.2, what is the social benefit that can be obtained by investing these sunk costs in an enterprise whose outcome is uncertain? No one knows who is going to "win" at the end of the trial. Posner, supra at footnote 15. Citigroup at 163-164, 163 n.2.

All that might be lost by accepting a settlement which calls for a transfer of $67,600 is an increase in the sanction for third tier violation to $100,000 – a "gain" or $32,400, which must be discounted by some probability that the SEC will lose. Citigroup at 163-164, 163 n.2. Section 21(B)(iii)(aa) [15 U.S.C. 78u(B)(iii)(aa)] of the Securities Act of 1934. See footnote 29, supra, on the lack of merit to the SEC's claim that if the matter went to trial, the SEC would seek to

---

[33] Posner, supra footnote 15.

"claw-back" Ms. Mulvaney's tuition "reimbursement" payments, i.e., require Ms. Mulvaney to pay twice for the college education that enhanced her human capital which she invested in productive work at Koss. See pp. 1-6 of Exhibit 2.

$32,400 is a small and wholly contingent social benefit compared with certain sunk costs of sending this matter to trial.

### 2. The Lack Of Participation In The SEC Filings Defense.

Another defense is available to Ms. Mulvaney. The defense of Ms. Mulvaney's lack of control over SEC filings, presents complicated "scienter" issues costly to resolve.

Again, this a securities fraud case, not a straightforward embezzlement and theft case – the subject matter of Ms. Sachdeva's criminal prosecution. The Justice Department did not charge Ms. Mulvaney with being an aider and abettor (or conspirator) to that crime.

The SEC case focuses on certain filings Koss made with the SEC and claims that Ms. Mulvaney was, at least, a cause of the falsity of the financial information embedded in those filings.[34]

Ms. Mulvaney has asserted in her Answer and in her Rule 26(a)(1)(A) initial disclosures that although she prepared in retail detail, various financial statements, including general journal and special ledger accounts, balance sheets, trial balances, income statements, etc., the global content of that data was dictated by Ms. Sachdeva, her superior. The final decision as to what financial statements, and economic data became embedded in the relevant filings was always made by Ms. Sachdeva and Michael Koss.[35] Ms. Mulvaney did not participate, face-to-face, in

---

[34] Docket No. 1, Complaint, ¶¶ 46-54, 62-63, 74-77.

[35] Mulvaney Answer, Docket No. 9, ¶¶ 2-3, 9, 11, 21-35, 46-48, 50-54, 62-63, 70, 75, 79-80, and 82. Mulvaney Rule 26(a)(1)(A) Disclosures, Docket No. 27, pp. 3-6.

any discussions leading to "finalization" of any SEC filings.[36] Ms. Sachdeva kept scrupulous control over any information passed to Grant Thornton, and any other outside auditor who did play an active role in the creation of the information incorporated in the required findings, and in fact, certified the reliability of the accounting procedures that generated the embedded data.[37] Ms. Mulvaney was directed by Ms. Sachdeva to provide no information to the outside auditors without Ms. Sachdeva's prior approval.[38] And, Ms. Sachdeva kept complete control over the bank reconciliation functions.[39] This was crucial to a "scheme" that involved transfers of Koss funds in depository banks by means of cashier's checks (bank checks) and wire transfers and non –recognition of income received, and deposited, plus overstatement of costs incurred and paid invoices from Koss bank accounts.[40]

It is undisputed that the only persons who signed the SEC filing and attested to their accuracy were Ms. Sachdeva and Michael Koss, the Koss CEO and CFO.[41]

The engagement of the pleadings creates an issue of whether Ms. Mulvaney, purposively aided and abetted the filing of the SEC reports she knew to contain false information. If so, she is guilty of a 10(b) and Rule 10b-5 violation.[42]

Resolution of that issue leads to an inquiry into the complicated relationships between Michael Koss, CEO and CFO of Koss, Ms. Sachdeva, Vice President For Finance, various

---

[36] Mulvaney Answer, Docket No. 9, ¶¶ 77-80 and 82; Mulvaney Rule 26 Initial Disclosures, Docket No. 27, pp. 5-6.

[37] Mulvaney Rule 26 Initial Disclosures, Docket No. 27, p. 3.

[38] Id.

[39] Paragraph 9 of Mulvaney Answer, Docket No. 9; Mulvaney Rule 26 Initial Disclosures, Docket Nos. 27, p. 3.

[40] Complaint, Docket No. 1, ¶¶ 12-17 and 32-35, and Mulvaney Answers to each of those allegations in Docket No. 9.

[41] Koss Corporation, supra, at 945, 947-949, 947 n.2, 951 n.7.

[42] 18 U.S.C. 20(e).

outside auditors, including Grant Thornton, and Ms. Mulvaney, the Senior Accountant, not to mention the members of Koss Board of Directors, who had at least nominal control over the content of the SEC filings.[43]

This is a dimension of the narrative that Ms. Mulvaney did not purposively, and with conscious awareness, play a significant role in the filing of reports with the SEC which contained false information about Koss Corporation's financial and economic position at various times. Given manipulations which reduced revenue earned and inflated business-related costs, the filings indicated that Koss' economic position was softer than the firm's "real" performance in the market.[44] The firm did better than the filings indicated. The embezzled funds, earned in the market, were not embedded in reported revenues, and operating costs were overstated, thus reported earnings, per share, were less than earnings generated by actual market performance.

But, again, Ms. Sachdeva must be presented as a witness to the process of creation of creation of the false filings, disrupting the procedures of the Bureau of Prisons, and increasing the security costs of this Court. Michael Koss and each member of the Board will testify about how the SEC reports were prepared at Koss, as will people from Grant Thornton, the outside auditor.[45]

This lengthy narrative absorbs much trial time, and creates the need for careful instructions to the jury on how to evaluate testimony about a process not within most people's experience. The jury must be instructed on how to evaluate testimony about just what was Ms. Mulvaney's relationship to all the players in the process. Careful instructions about "credibility"

---

[43] Koss Corporation, supra, at 948-957; Mulvaney Answer, Docket No. 9, ¶¶ 25, 70, 79-80 and 82; and Mulvaney Rule 26(a)(1) Initial Disclosures, Docket No. 27, pp. 5-6.

[44] Mulvaney Answer, Docket No. 9, ¶¶ 12-16, 18, 23-24, 31 and 33-35.

[45] Mulvaney Rule 26(a)(1) Initial Disclosures, Docket No. 27, pp. 13-21.

are important here. And, of course, the Court will have to deal with many "objections" about testimony related to the filing process. Cries of "lack of foundation" will ring through the courtroom, and must be resolved on the spot.

All this sunk cost will be incurred in order to obtain a social benefit of an uncertain enhancement, by some $32,000, of the now agreed-upon sanctions of $67,600.

A straightforward social cost/social benefit ratio that emerges from consideration of the trial/no trial alternatives implies acceptance of the Consent Judgment as proposed.

II. **THE CONSTITUTIONAL PRINCIPLE OF SEPARATION OF POWERS IMPLIES THAT THE COURT SHOULD ACCEPT THE SOCIAL COST/SOCIAL BENEFIT CALCULUS OF THE SEC, AN EXECUTIVE PROSECUROTIRAL AGENCY, WHICH IS WILLING TO ACCEPT THE SOCIAL BENEFIT OF AVOIDANCE OF CONSIDERABLE LITIGATION COSTS. IN THE FACE OF AN UNCERTAIN OUTCOME, IN EXCHANGE FOR A $67,600 TRANSFER AND A NON-ADMISSION OF LIABILITY CLAUSE.**

A. **Whose Decision Is It, Anyway?**

Any questions concerning the specificity of the conduct by Ms. Mulvaney, to be enjoined prospectively, and enforced by the Court's contempt power, appear to have been resolved or can easily be resolved by any additional amendments to the decree. If an Article III count is being called upon to exercise its Article III powers to actively regulate conduct going forward, that court is well within its constitutional authority to insist that the regulated conduct be defined in a detail satisfactory to the court.

It is a different matter when an Article III court is asked to accept a decision by an executive branch prosecutor that an agreed-upon exchange in settlement of litigation, ex ante, confers a net social benefit.

Ms. Mulvaney has presented for the Court's consideration, a cost/benefit analysis, which when considered de novo by the Court, should yield the conclusion that this settlement, under

these particular circumstances, of sunk cost, potential maximum enhancement of sanction, and uncertainty of final outcome, does confer a net social benefit – the goal embedded in the mantra of the Second Circuit – is the settlement "reasonable, fair, adequate, and in the public interest."[46] (This particular formulation of the standard or model for analysis of whether a proposed settlement should be accepted has never been affirmatively endorsed by the Supreme Court or the 7th Circuit. A model for analysis that focuses on whether a settlement confers a "net social benefit" takes into account all the relevant variables, and provides a less redundant and more direct, coherent way of talking about the issue of acceptance/non-acceptance.]

But the logically prior, and more fundamental issue is, does the Court have authority to conduct a de novo cost/benefit analysis of the proposed settlement, or must the Court defer to the SEC's judgment of net social benefit, unless relevant variables have been obviously ignored? The correct answer was provided by the Second Circuit in Citigroup. The Court must defer to a cost/benefit calculation reasonably performed by the executive agency. This constraint on the Court's decision-making power derives from the doctrine of separation of powers embedded in the structure of the constitutional text and a long history embedded in settled decisional law.[47]

In a capitalist economic system, it is obviously important that capital flow, at the least cost, to the most productive uses. That goal can be best achieved by granting broad freedom to the parties most affected – investors and firms seeking capital to make the "deals" they believe best serves their interests as they see those interests. However, the system can work only if reliable information is available to investors at low information-seeking costs. Hence, the

---

[46] Citigroup, supra at 161.

[47] Citigroup, supra at 163-165, 168.

requirement of registration of securities, and full and true disclosure of relevant information, pursuant to a system of regulation actively managed by a public institution – the SEC.

Fraud is never efficient. So regulation of the content of disclosure, and prosecution of outright purposive, profit-seeking fraud is also assigned to a public agency – the SEC – who can perform the gatekeeper, watchdog function at a cost broadly dispersed to members of society through the tax system.

The SEC is a critical player in ensuring the efficient operation of capital markets.

The SEC operates from a fixed budget established by congressional appropriations. The parameters of its regulatory efforts are set by political decisions by accountable political people. Within those constraints, the SEC must decide how to efficiently allocate scarce prosecutorial resources.[48]

That task involves another layer of political judgment. A social cost/social benefit analysis directed, at determining whether to settle or litigate is not purely a matter of empirical, quantitative inquiry. Value judgments are always involved. The inevitable trade-off between pushing for maximum sanctions, as an enforcement strategy, or settling for optimal sanctions which achieve sufficient deterrence, special and general, without unduly discouraging development of innovative financial products, which finance promising, but uncertain projects, involves weighing one value – "protection" of investors, against another – encouraging the flow of capital according to the expressed preferences of the market, which in the long-run, will lead to more efficient allocation of capital than will a heavy command-and-control system. But that choice between values involves politics with a big "P." What relationships <u>ought</u> to prevail?

---

[48] See generally, Posner, footnote 15, <u>supra</u>.

The heated debates over regulation or deregulation – which system yields the net social welfare – is a <u>political</u> debate.

Those matters are not matters for the Court. The SEC, as an executive branch prosecutor, has determined that the appropriate aggregate sanction is $67,600, about 2/3 of the maximum sanction, politically responsible legislative decision-makers have determined is appropriate for the offense with which Ms. Mulvaney has been charged.[49] That sanction reduces Ms. Mulvaney's net worth as of April 1, 2011, by about 25%.[50] No small hit.

This is the kind of empirical <u>and</u> value judgment, about optimal enforcement of the securities law that has been assigned to the political branches of government, executive and congressional, by our constitutional structure separating the powers of government.[51]

## CONCLUSION

District Judge Rakoff took it upon himself to decide what sanction to be imposed on Citigroup was necessary to prevent another financial crisis, with a resulting deep recession.[52] In his view of 285 million transfer without an admission of guilt was not sufficient.[53] It is unclear from his opinion whether an admission of liability without an increase in the magnitude of the sanction, would have satisfied Judge Rakoff.[54] He called a 285 million transfer "mild and modest," mere "pocket change." 827 F.Supp. at 330, 333-334.

---

[49] Section 21(B)(iii)(aa) [15 U.S.C. 78u(B)(iii)(aa)].

[50] See Exhibit 2 to this filing, Ms. Mulvaney's sworn net worth statement to the SEC of April 1, 2011, pp. 1-3.

[51] <u>Citigroup, supra</u> at 163-165, 168.

[52] <u>SEC v. Citigroup Global Markets</u>, 827 F.Supp. 328, 331-335 (S.D. N.Y. 2011).

[53] <u>Citigroup, supra</u> at footnote 52 of this Brief.

[54] <u>Id.</u>
17
Case 2:10-cv-00747-RTR   Filed 11/05/12   Page 17 of 18   Document 44

But as the "stay" panel of the Circuit Court emphatically held that was not a judgment to be made by a politically unaccountable federal district judge with life tenure.[55] If the SEC has been captured by Wall Street, well, relief has to come from the executive and the congress and, of course, ultimately from us voters and taxpayers. That's our system.

The SEC is satisfied that an aggregate sanction equal to 25% of Ms. Mulvaney's net worth, and 2/3 of the statutory maximum represents the satisfaction of an optimal enforcement policy, given the uncertainty of the outcome, ex ante a trial. Ms. Mulvaney has demonstrated that the sunk costs of a trial of difficult issues, and uncertain outcome, when considered ex ante the trial, exceed the social benefit of a 1/3 enhancement of the maximum sanction (32,400), should the SEC prevail at trial, hardly a certain outcome.

The proposed Consent Decree, resting on the December 19, 2011 mutual settlement agreement, should be accepted.

Dated at Milwaukee, Wisconsin, this 5th day of November, 2012.

> KRUKOWSKI & COSTELLO, S.C
>
> By:  s/David F. Loeffler
> David F. Loeffler
> *WI State Bar No.: 01008044*
> 1243 N. 10th St., Suite 250
> Milwaukee, WI 53205
> (414) 988-8400
> (414) 988-8402
>
> ATTORNEYS FOR DEFENDANT
> JULIE MULVANEY

146561/2010001-1

---

[55] Citigroup, supra at 163-165, 168.